This is our last case of today and I just wanted to thank counsel for being so patient and waiting for us. This number is 19-1408 and 20-2078 BC v. Attorney General. Mr. Talante and Mr. Ramnitz. Mr. Talante. May it please the court. I was going to say good morning based on my presentation, but I'll say good afternoon. My name is Sophie Talante and I represent the petitioner BC in this case. I would like to reserve three minutes for rebuttal with the court's permission. You'll get your three minutes and probably more. The fastest prologue will go way over. And I know there are obviously a lot of issues at stake in this case, but with the court's permission, I really want to focus my time on two arguments, each of which is an independent ground for reversing and remanding the matter. And obviously I'm aware that the court's very much interested in the language access issue as evidenced by the request for supplemental briefing. But I want to get to the first point, which is that the BIA abused its discretion by failing to reopen or remand the case to the IJ when BC presented evidence of his SCNC card, which was conclusive proof of his membership in a banned organization, which boasted his credibility and which, despite his multiple requests, was suppressed by the government for over a year, including before and during his hearing. And its absence was used to attack his, successfully attack his credibility during the hearing. And obviously the second issue is that there's no substantial evidence showing that the IJ complied with the EOIR's binding language access plan, which compelled that he identify BC as limited English proficient and permit him to participate in asylum proceedings with an interpreter for pidgin English, which is his primary language. Under the ACARDI principle, as understood by this court in Leslie, which I see Judge Ambrose in the panel, the violation of this procedure rule, which protects fundamental rights, compels reversal and remand. And I want to take those in turn, and I suspect that probably won't get too far before your honors pepper me with questions. But let me, let me talk about the first issue really quickly. In connection with the motion to reopen, as this court is aware, BC presented a card conclusively establishing that he was a member of the Southern Cameroon's National Council. In Taliha, this court said on a motion to reopen, the BIA must actually consider the evidence and argument that a party presents and may not summarily dismiss the motion. The BIA failed to do that here. Rather than review BC's motion by looking at the evidence of record and offering analysis of its reason, the BIA summarily dismissed the evidence in a three sentence paragraph. This warrants reversal. The objective evidence. Just to clarify, if on the basis of the language issue, whether we were addressing that as a matter of compliance with the plan or simply as a matter of due process, if we ended up vacating and remanding on that basis, there's no need for us to address the motion to reopen or motion to consider, right? I think that's correct, Judge Krause. And that is why I posited these as two independent grounds. In other words, the court can very well, on the basis of the BIA's failure to reopen or remand based on the STNC, presentation of the STNC card, that's an independent basis, as well as the failure to comply with the EOIR's language access plan. And if there were a new hearing at that point, the card would come in. Yes, Your Honor. The card would come in. And there are a lot of, the reason we're really focused on this card, and I wanted to start with it, is really this is a game changer. And I'm not an asylum law expert as my co-counsel, but there's really no more important evidence in an asylum case than evidence that you are a member of a group for which there is no dispute based on the country records, country reports that were before the IJ. And the IJ itself admitted that there's no dispute that people who are seeking secession from Cameroon for the Northwest portion of Cameroon are being persecuted. And so there's no, the only issue was whether or not there's a nexus between, is BC himself a member of STNC? And once he's able to establish that, he's been able, he would be able to make a prima facie claim. And the BIA's analysis with what made it improper is they concluded that because there's adverse credibility, it meant that there was no need to actually assess both the weight and the credibility and the impact of this card. And that's why we think it's incredibly important. And on the record, just for the court's benefit, in the record of page 663, there is evidence there that Cameroon had banned STNC in January 2017. And that was before the immigration judge as part of the exhibits. And the immigration judge also said at the end of the hearing, it's problematic for true issue, was BC himself a true SNC supporter. And so, and I think it's important, and I've gone back and looked at the record, and I have to apologize to the court because it appears that the card that's in the record before this court is in black and white, whereas the card that was before the BIA was a true color one. And there's a big distinction because you can then see that there are markings on there, there are dates, there are stamps that show, which we believe makes it credible and objective. And at this court held in Saudia and other cases, that there's nothing that's inherently distinct about the card that would make the court, make the BIA believe it's not credible. So the BIA had to assume the truth of the card at the time it was presented. So can I just ask a question about kind of the role of the card overall and kind of, you know, just play what changes, what doesn't sort of thing. Let's say that, let's say the card comes in. Let's say it was a mistake not to have the card because it wasn't available earlier, wasn't part of the A file earlier. So it was a mistake not to reopen the card. But let's say that the BIA wants to still maintain its adverse credibility finding. And this is again, putting the English and the Pidgin English question off to the side for the moment. Could your client qualify for relief with an adverse credibility, an overall adverse credibility finding, but admission of the card into the administrative record and then do its analysis from there? Or does that adverse credibility finding kind of just swallow up the card and the nexus and anything else that you'd ever derived from the card? That seems to be the position the BIA took. And we believe it's improper because the BIA never gave credit to what the card really meant in the context of this case for a couple of reasons. One, and it's important, one of the issues here, and we go back sort of my original point, is that was he a member, right? And that's something that was in the immigration judge's questioning. And the card also really, you know, because once the card's admitted, now we have a prima facie case, right? He's met all the elements on the face of it, of establishing relief. But I think it's important, Judge Phipps, to read what the card is. And I'll get to directly answering your question in terms of that. The card says, I pledge to fight if need be to defend, sacrifice, and serve the fatherland, Southern Cameroons, under the banner of the SCNC. So this is one of the, you know, you hear about a get out of jail free card. This is a guaranteed to go to jail card because it was the piece of evidence that the immigration judge was specifically asking for. And in his decision, he actually faulted BC by saying, you say you're an SCNC member, but you have not provided me any evidence. And I'll get to the point where the government had the evidence the entire time. And some of the due process concerns that causes. But also the card had value in terms of credibility to rebut the issue about his membership in the SCNC. If you recall in the CFI credible fear interview, there was a dispute about was he a supporter or was he a member? And the card makes inclusive that he actually was a member. So that would rehabilitate that. But also what the BIA overlooked was that the record makes very clear, despite what the decision may ultimately have said from the immigration judge, if you look at the contemporaneous record, the immigration judge repeated that it was a close call. He wasn't sure. And he actually said, somebody's going to be upset with me because I need to think about this. And when DHS counsel was asked about what do you think? The first thing she said, we're not sure if he's just a supporter because his brother may be a member or he's actually a true SCNC member. So the BIA should have evaluated the constellation of facts. The way we see it is like it's a puzzle. All the evidence in the case comes to the puzzle. The card is the missing piece. The card is the one that's possible. He's his story. But even so, let's say, so let's, the card's big and important. Everyone at every stage of this administrative process, as far as I can tell, recognizes that the card is very important. I guess what I'm saying though, is let's just say that there was a complete reevaluation of the entire record, including the card, consistent with the motion to reopen. And then for reasons that you may disagree with, and I've read those in your brief, the IJ and the BIA still said, no, adverse credibility finding. Could your client still get relief under that scenario? Or would that adverse credibility finding kind of foreclose that? Or would you say, well, and now we have another appeal on our hands. Judge Fitch, just to understand, you're saying if the card comes into the record, is remanded before the immigration judge, is immigration judge bound by the earlier adverse credibility finding, or is it- Or regardless of being bound, continues to make the same adverse credibility findings. Could your client get relief in that context, or would the consideration of the whole record, inclusive of an adverse credibility finding, still give you kind of a path to victory? We think that once it's, if it's remanded, the record's reopened, given the centrality of the card, in terms of the entire case, that it would need to be reexamined. Because the standard here is not that we show that we win at this particular, in this posture. As this case, as this court is held in Gould, while we cannot say that the petitioner is entitled to asylum, the only question is whether you're persuaded that at least he deserves a hearing. And that's our argument, that at a minimum, the BIA, again, we're looking at a, we filed country reports, we filed, obviously, the card. The BIA dismissed this argument in one paragraph, without identifying the centrality of the card, without recognizing- Just to clarify, at least my understanding of and what I share, when it comes to the, say, hypothetically, we were prepared to reopen for a hearing that included the card, is that all the reliefs you're asking for? Or are you asking us, in addition to that, to revisit the adverse credibility finding? We're asking for that the record be reopened to allow for the card and for us to be able to present the card, and particularly to present the case in a posture where the card, which establishes, which again, makes a prima facie claim for asylum, allows the immigration judge to consider it. And we believe that given the immigration judge specifically said, you may say you're an SCNC but you provided me no information, that that changes the entire nature of the case and how the case proceeds. Isn't there more than just the card? Back to Judge Krause's question on adverse credibility. Yeah, the card relates to whether the Cameroonian government was targeting him, perhaps. Yes. But there was also a statement by the IJ that there were inconsistencies with respect to his discussion of his cousin, inconsistencies as to whether he previously applied for asylum, implausible testimony as to how he was able to leave Cameroon without a passport, et cetera, and inadequate letters of support. So do you wish to leave those in place? Or are you asking us that those adverse credibility determinations that don't necessarily relate to the card also be revisited? We think that given the immigration judge's uncertainty about the case and how certainly he described it as a close call, that the presence of the card allows the judge to re-examine everything else. And I think, quite frankly, that would be, if he comes in and he says, I'm an SCNC member, here's my card, I've had this since October 2013, that allows the judge to then say, well, I find you to be, you may be more credible now because now you've provided me evidence of this card that you're an SCNC member. Now I can see that your brother, who, again, we provided evidence that we've corroborated of his death certificate, now that it makes that more compelling that your brother was an SCNC member and died during this uprising. So that at this point, the opportunity to allow the immigration judge to make a re-examination of the record, which may lead to the judge not placing weight on those inconsistencies. But when you have somebody who says, give me relief, I'm a member of the SCNC, I have nothing to show you other than this other peripheral evidence, I think it puts the case in a different posture. And at a minimum, the BIA should have allowed the circumstances. But for example, why couldn't the immigration judge say, okay, the card comes in, but your statement as to how you got out of the country without a passport doesn't make any sense to me? The judge could also be, I mean, we're not, at this point, we're not saying that if the card comes in, and again, you know, prima facie case that it's asylum, it goes back for the judge, the judge doesn't say, I believe you're a member, but I still find inconsistencies that can't be resolved. I mean, it's not, you know, but we're asking for the opportunity at this posture. We're not prepared to say, you know, we need to show that we're going to win. But I think that, you know, this judge, given this record, this is what he was looking for. And this was, you know, we discovered it. And I'll get to that. We were able to obtain it six, seven months after the proceeding. And so that's where, and in Guo, Your Honor, I mean, you had noted that in that case, there was an adverse credibility finding. And the BIA, again, sort of concluded that because there's an adverse credibility finding in the record, that means, you know, it sort of stays with you forever. It's a stain that you carry the scarlet letter. And that's our point that, you know, notwithstanding the adverse credibility, that did not relieve the BIA from actually doing an analysis, looking at the entire record, now marrying it to the country report, where that talks about SCNC, and giving the immigration judge the opportunity to look at the case in a very much a different light. And that's our fundamental argument. The BIA, if it wishes to, if we send it back to the BIA, the BIA could leap over the issue of the card and simply reaffirm its decision on the basis of its adverse credibility determination, basis of, right, of substantial evidence, even taking account of the card. If the BIA does that, Your Honor, we would think that would be an error because of the, because the immigration judge in the first instance, had the immigration judge had the card, there's a reasonable likelihood that the immigration judge, notwithstanding these findings, and by the way, Judge Embraer, I missed the opportunity to, on the issue about the way he got out of Cameroon, that was an issue where the BIA expressly indicated that they were not relying on that. In other words, to the extent that, to the extent that that conclusion by the immigration judge, which involved the immigration judge going on the internet and trying to find, you know, based on the immigration judge's belief that after 9-11 this doesn't happen anymore, the BIA expressly said that they were not relying on that extrinsic evidence. And without that extrinsic evidence, then it was pure speculation. So it's our position that that's no longer a basis for a diverse credibility finding, at least an administrative record, based on the BIA's. So, can I just be clear? Because I had understood before us were the affirmance on the order of removal itself, on the sort of merits determination of the immigration judge, and as well as separately the rulings on the motion to reconsider and the motion to reopen. Do I understand now that you are only proceeding on the basis of the motion to reopen or reconsider? You're not asking us at this point to address the underlying merits determination initially affirmed by the BIA as regards to language issues? No, we're asking for all of them. We're asking that you, you know, there are multiple grounds in our view for reversing the BIA. And I'm highlighting, at least initially, just the issue about the card. So, we're not forfeiting all the other potential paths for attacking what the BIA did and the immigration judge did in this case. It seems that now might be, I mean, I don't know, Tom, if you or Cheryl, if you have questions, Judge Ember or Judge Cross. Yeah, but one of the things I found in your supplemental filing about the language access plan was... I'm sorry to interrupt. I just wanted to just one final point on the card and then I'm prepared to pivot because I'm concerned I may not get back, if you don't mind, Your Honor. Yeah, sure. No, the only issue, the final issue I wanted to make on the card is that, you know, the fundamental unfairness with the fact that the card during the entire time was in the possession of the government. And so the BIA offered no assessment that from January 2018 when BC crossed the border until March 2019, including during the merits hearing, the card was in the government's possession. And, you know, we sort of wanted to highlight the fundamental fairness of the government really towarding BC's repeated requests to obtain just a copy of the most and then the government arguing vigorously and ultimately successfully that the absence of such evidence renders him not credible and defeats his claim for asylum. And so the government had the inherent advantage because it's literally impossible for him to actually present this card because it was in the government's possession. And the government had notice of it. He made multiple requests. It's actually in the record before the immigration judge in exhibit seven. And I have to tell you, Your Honors, I've tried and cannot find any other circumstance where the government withheld such critical evidence from an asylee in an immigration hearing and then use the absence of that very evidence to impeach him. And so I just wanted to get that in there, Judge Fitch, because I, you know, in any other context, a criminal case, civil case, this would be subject to sanctions. But here, you know, when he finally obtains the card, we actually anticipated the government would agree to remand. But then that card, which is so critical, its absence is then used against him. So I just wanted to make sure I put that in there because there are really due process concerns there. And that was a point that you argued well in your brief. Why don't we go to the language? I'm ready for the language. I apologize. No problem. You know, on the language access claim, you know, in the supplemental briefing, you suggest that these are binding on the agency. And I guess what I would say is when I read the statutory language, it suggests that the quotes that you have from the statute indicates that the agencies have to promulgate these plans, not that they have to promulgate binding plans. And then the plans themselves don't indicate that they are binding. And so it strikes me that it's almost like Congress saying, hey, we'd like you to tell the world what your thoughts are, what your policies are. You aren't bound by it. Just in the name of kind of incremental disclosure, tell everyone what those are. And so those come out as probably policy statements. So I guess my thought is if these are just policy statements, failure to comply with a Leslie, does it? If they were policy statements, and they're not for a couple of reasons. One, and I know you just mentioned the statute. You gave us more credit than we deserve. It's the executive order by. So sorry. Yeah. Yeah. And I just want to make sure I don't I missed the statute. Yeah. The executive order 13166 is binding. It directs the federal, it directs federal agencies to promulgate a plan. And we quoted the shawl language. There was no discretion in terms of what they must do. And to be frank, they didn't do it. Many of them didn't do it for over a decade. Because if you recall, the executive order indicated a 120 day period. But beyond that, and you saw, we sort of threw at the court additional appendix. And the reason we did that was to underscore that over the period of but it's not been 20 years, the Department of Justice in response to EO 13166 had made clear that this was a responsibility that all 95 federal agencies had to ensure that limited English proficient persons are able to meaningfully access to programs. And with respect to EOIR, as you know, DOJ had its own plan. But as a component, it was entitled to implement its own. In the beginning, in the preamble, it makes clear that all personnel are to follow it. In other words, that, you know, this is pursuant to the regulations, pursuant to Title VI, pursuant to EOIR Executive Order 13166. So in other words, that EOIR did not have the discretion to say, we're not going to implement a plan or follow the DOJ plan, which is the plan. But I guess the nuance is, yes, there was a command. And thank you for the correction, it was Executive Order. There was a command in Executive Order to promulgate plans. But what is it that suggests that there was a command to promulgate a binding plan, a plan that would be binding on the agency, as opposed to kind of an advisory plan, a best practices sort of document or, you know, when I read some of these documents, I thought to myself, it's at best ambiguous as to whether this command is to kind of prepare a best but I don't see anything saying there has to be a binding plan, there has to be a plan that's binding, nor do I see the plan saying this is binding. And so if both of those kind of opportunities for binding this are absent, then it seems that there's a problem getting the lesson. Well, we, we, we pointed the court to the Pereira case, and we are understandably that that case was not, does not flow from a plan that's at issue here. But we cited it as an example of that the DOJ, well, agencies enforce these plans such that anyone who fails to follow it is subject to discipline. And the very Department of Justice in this case, goes to court and defends it so that there's no discretion, if I'm, if I'm a EOIR personnel, to, to, to ignore the plan, to, to sort of do what I, what I deem best in terms of LEP persons. And so, you know, we, we, we think that if the, if the President says you have to issue these plans, the Department of Justice, under multiple administrations said you have to issue these plans. And by the way, I think Attorney General Holder essentially, you know, reiterated that in very strong terms, because some agencies were not implementing them. And then once the, once the plans are implemented, that they're, they're followed. And, and one evidence that they're binding Judge Phipps is that, you know, to, to the, to the, as far as we understand, the, the agencies do follow these plans, you know, that they, they, they understand that the, the plans are really important. And DOJ, because DOJ obviously, as you know, these plans not just apply to the agencies, but EO, EO, Executive Order 13166 also requires regulations for, for federal recipients, you know, recipients of federal funds. So DOJ, using its authority, has actually gone after folks who are receiving federal funds to ensure that they're, they're complying with it. And, and DOJ has actually also repeated that the same four-step process that, that applies to federal recipients of, of, of, of funds and grants also applies to agencies. So we, we don't think that there's, there's an issue as to whether or not they're binding. And I understand where, where your honor is going with distinguishing it, perhaps. I mean, I guess, I guess most things, most things that are binding are codified in the CFR. Most things that are binding go through comment rulemaking. I understand your honor, but Leslie, yeah, Leslie itself relied on, on cases where the plans or the procedures in there were not, were not, did not fit those, those definitions. In other words, you know, they're, they're equally binding, but had not gone through, through rulemaking, had not. And actually I think this plan is, is in a better posture than, than what we had in Morton v. Ruiz, which was as an internal legislative manual, is that the BIA, there was a Bureau of Indian Affairs, which had a way to assess who gets, who gets benefits in terms of whether you're in a reservation or a near reservation. And, and the Supreme Court in that case said, well, notwithstanding it's an internal manual and it's not codified, it's not gone through rulemaking, it, because it, it affects fundamental rights, you're, you're, you're bound to it. And in Yellen, that was a case that involved the, the rule of the House Un-American Activities Committee, where, you know, the, the, and this is an internal congressional committee rule that says you're entitled to executive session if, if, if some information about you is going to be embarrassing, that, and then again, the Supreme Court ruled that notwithstanding that it's a, it's an internal rule of a congressional committee, they were bound to follow it, again, because it impacted fundamental rights. So, so the line I'm drawing, Judge Phipps, is, is not whether or not the particular rule is, is a regulation or has gone through formal rulemaking. The, the issue really is whether or not it actually, it impacts fundamental rights and, and, and it flows from some statutory or constitutional imperative. And we believe that this, the, the, the plan here does. And by the way, even though it hadn't gone through rulemaking, there was a process where stakeholders were, and it says so, it details in the plan, where stakeholders were consulted, where there's a requirement that it be publicly available. So we think this is actually a, a, a stronger evidence of, of, of binding this than you had in Morton. Is, is BC currently in custody? No, he's not. I can't recall when, when he, as, as, as the court's aware, I, I came in late into the case. So I don't, I can't recall precisely when he was released, but he's not in custody now. Do, do, do you need the benefit of presumption and for, to, to move forward on your argument? We, we, the benefit of presumption and, Dan, did, did, did he? We've argued, as the court's aware, that we've argued that, you know, there, there, there was prejudice in this case. And so obviously we, we prefer the presumption, but even without a presumption, we believe that this, on this record, that there, there was prejudice to, to BC given his limited English proficiency. And, and, and I can go through a couple of examples, but we, we obviously prefer that Leslie be applied under these circumstances because the fundamental rights here involved, which is one, obviously the, the effort to eliminate national origin discrimination, which was right at the beginning of the executive order. Two, the, the, his ability to meaningfully participate under due process in these proceedings, particularly if you're given, given that it involves a potential removal and potentially relocation into the country where he may be tortured. And three, that also international law, the court saw a great amicus brief by Sarah Fialetti, international law actually supports us that there'd be no refoundment. But to answer your question, just cross, we, we do believe on this record, there's prejudice that there wasn't, there was a, a misunderstanding between Judge Ellington and BC regarding his ability to participate. In other words, Judge Ellington believed that BC spoke English, like, like proper English. And that the, this idea that he's a pidgin English speaker, this pidgin English notion was, was, was not real. And he even said, I know pidgin English. And at the end, after there was an extensive colloquy, he said, you know, you don't, you don't need, you don't need English, you know, you're, you're fine as you are. And so on that record, it meant that he, he, one, he actually thought that he was, that, that BC was not credible, that he was making this up. Two, and you saw that in the demeanor, his, his conclusion about the adverse credibility finding based on demeanor, where he found him unnatural and robotic. And, and our argument is that the reason he was unnatural and robotic is because he was trying to participate in a, in a judicial proceeding where, in a, in a, in a language that's not his best language. And he wanted to make sure that, you know, he, he got it right. There are multiple occasions where there, there are at least 41 times where the, the, the court reporter, I guess a transcriber indicated it was indiscernible. He was told to slow down multiple times. There's reference to accent. And I understand the, the BIA and the government position is under due process. This is not enough to, to change the outcome of the case. Part of the, part of the, part of the, from the government's point of view, speaking of multiple times, BC stated multiple times that he could proceed in English and that he is an Anglophone. And so that would give the impression to a NIJ that, okay, he, he understands. And so then you really, your point is, but when you start looking at the record and see so many indecipherables and things that were clearly an indication of, of a language problem, there should have been more of a review or more digging to find out to what extent is English different from pidgin English. That's correct, your honor. And, and two quick points on that on the first is at the, at the moment that he first appeared in the master calendar hearing before Judge Ellington, at that point, the judge had no indication of his English proficiency or lack thereof. In other words, he didn't have the critical credible fear interview transcript before him. There was no asylum application at that point. And our argument is that he should have inquired. And as the language, and he didn't do that. And two, notwithstanding, even under the government's argument of reasonable, reasonable efforts or reasonable steps at the point where BC communicates the judge, my, my, my local language, my best language is pidgin English. That's the language I speak at home. That's my language, the language my parents speak. At that point, the judge was on notice should have been some reasonable efforts to take steps to ensure that he was able to fully participate in the proceedings. And the final point, Judge Ambrose is his ability to fill out an asylum application in jail with some time to, to write it out is not, it does not mean that he's proficient to be able to participate in a court proceeding, pro se, under cross examination, under very, an impatient and understandably impatient judge that, you know, the proficiency of the plan, the plan defines it is you can be proficient for one thing, you can be proficient in writing or speaking, it doesn't mean that you're proficient for for something else. And in and we cited in our, in the appendix, we actually made the same argument when because one thing DOJ does is because many state courts receive federal funds from the Department of Justice, it means the Department of Justice actually goes in and ensures that DOJ, that these state courts are complying with language access. And one of the things they make clear repeatedly, and this is from Vanita Gupta, who's, who's the interim acting AAG at the time is now going to be the Associate Attorney General, made clear that, you know, a courtroom is different, a courtroom where you're using technical terms, where your whole life is at stake, it's very, very different. So now withstanding, if he can fill out his asylum application, or he can say something else, that at the end of the day, you know, I don't think I don't think there's any question. And we had an expert who actually talked to him in Pidgin, and talked to him in proper English, and indicated how different it was that you would have been in much better footing. If he if he was able to participate with a Pidgin English interpreter. All right, why don't we, unless my colleagues have any questions, we'll get you back in rebuttal and go to Mr. Remnitz. Thank you, Your Honor. Thank you. Mr. Remnitz, and I'm going to walk the question and grab a document because I my iPad was going low on me. So wait to come back or be right there. Okay. Okay, whenever you're ready, Mr. Remnitz. May I please record Your Honor, Senator Remnitz on behalf of the United States Attorney General. In this case, petitioner challenged the decision of the agency finding they failed to present credible testimony, supported his applications for relief and protection. Substantial evidence supports this finding because the agency has had numerous inconsistencies between petitioner's testimony, between his testimony and his asylum interview, between his asylum interview and his asylum application, including a demeanor finding and including implausibility finding in support of this adverse credibility determination. I think I think the issue is that a host of issues, whether relating to adverse credibility and everything else, really sources down to the person's ability to understand the questions posed to him in standard English. And so for at least for me, a basic question, a basic question, a basic question is to what extent does the IJ need to make a determination that this person really understands how I'm communicating with him. That extent is reasonableness. That's been the standard before and after EOIR adopted their language access plan that's replete in this court's case law and every other circuit appeals case law. They simply looked at it under the substantial evidence standard and whether immigration judge reasonably determined that someone had proficiency in English or conversely was a limited English proficient person or LEP. And that's what the immigration judge did here was made a reasonable determination. And this is based on many different parts of the evidence, but most certainly by petitioner's own admission in his brief to the board that he had no trouble understanding the immigration judge and the immigration judge had no trouble understanding him when he testified in English. And this is also the colloquy that you'll see at the end of the merits hearing where petitioner first brings up the fact that he spoke pidgin English with his parents at home. The immigration judge is kind of taken aback when he says, what do you, when you bring up that idea of a language barrier, what do you mean? He says specifically, you speak English, I speak English. We appear to be completely understanding each other. What do you mean? And this is what the immigration judge is looking at is that this is his own admission that there was no trouble understanding each other. And this is where he is also in the asylum interview. You'll see an extended colloquy at the beginning of the asylum interview. Petitioner self-identifies that his native language is English. He said he speaks it in his day-to-day life. I thought it was, I thought his native language or his primary language, the one he most understood was pidgin English. Is that correct? That's his native language, but he represented before the asylum officer that his native language was English. He never requested interpreter in any other language. In fact, when they asked him if he wanted a French interpreter, he said, no, I speak English. He never, never raised any idea of pidgin English until the end of his merits hearing after he testified in English and the immigration judge told him he was going to be found adversely credible. He then explained that perhaps his inconsistencies were because he grew up speaking pidgin English in his home with his parents. But meanwhile, they had no trouble understanding each other throughout the entire merits hearing. Meanwhile, he and the asylum officer had no trouble understanding each other in English. He wrote his asylum application. Well, that's, that's what his admissions are, but, but I think there's a it wasn't quite as seamless as you're making it out to be. He said there were 41 instances. Actually, we counted like 44 where it appears that they, they were not understanding each other. They, Mr. VC was not understanding the question or was responding to something that was different. And then we find out later on from the people who testified that there is a significant difference between pidgin English and standard English. So it's not like you have a dialect similar to New England versus the Southern United States. It's, it's very, very different than that. You're referring to the expert declaration submitted with a motion to reopen. Yes, sir. Yes. And there is an acknowledged difference between those two English and English, but the question still comes down to whether or not the integration that was reasonable in proceeding in English. And despite indiscernibles in the record, the government still has yet to see any exchange that is where they couldn't understand each other. And for example, these are the cases that the government cited in answering brief. Um, I'm really do poorly with these names, but that was the Sauron and abolition, Bali, where it was very clear in the record. They cited examples where parts of the transcript were non-responsive answers where they couldn't understand each other. Whether you translator said, I can't understand what he's saying. Immigration just said, I can't understand what he's saying. That's not present here. And in fact, again, just to admit they had no trouble understanding each other. And while these two extra reports talked about kids in English, and they said they listened to the audio hearing and they found that you couldn't understand each other. You'll see absent from these reports, any specifics, anything cited saying, well, this is the part where I listened to, and they couldn't understand each other. Just a very vague assertions that they couldn't understand each other. Meanwhile, everything else in the record that we can look at the transcripts, we found interview the transcript of the hearing. There's no trouble with him testifying in English. This was in the government's point of view and the immigration judge's point of view. This was kind of a post hoc rationalization for his inconsistent testimony. He has self-identified multiple times as an English speaker. In fact, a native English speaker. When asked if he spoke any other languages, he spoke French. He never mentioned pidgin English. Why doesn't that just point up the need at the outset, even when someone is an English speaker, to ascertain whether that is in fact the same language? It seems easily within the realm of reasonable that we would have here BC saying he spoke English, intending that he was referring to English as he knows it as pidgin English. The listener, the judge, interpreted that to mean standard or proper English. That's just a miscommunication. I'm not sure that that's evidence that he was representing that he spoke proper or standard English. Is it? It could be a misunderstanding. However, we're looking at whether the immigration judge's actions were reasonable. At the outset of the hearing, he said, I speak English. His merits hearing, he reiterates, I speak English, I'm an English speaker. He then proceeds to testify in English, which the immigration judge had no trouble understanding, besides the immigration judge noting that they both had accents at one point. This is all part of that reasonable determination. Was it reasonable for the immigration judge to proceed in standard English when he wasn't even aware of pidgin English until the very end of the merits hearing? The whole rest of the time, the immigration judge had no trouble understanding him in standard English. The purpose of the LEP policy directive EIORs, it says the purpose of this policy is to eliminate or reduce to the maximum extent practicable. Limited English proficiency is a barrier to progress. Despite the statements made at the outset, there was some difficulty understanding and communicating to the questions of the IJ, perhaps because he was speaking so quickly compared to what BC understood. I don't know. At the outset, shouldn't there have been something done by the IJ to determine whether there was an adequate language proficiency in English, and if there was any question, just to bring in an interpreter or a translator? Yeah, and the governor agrees with that. There should be some assessment that whether or not he can proceed in English, and that occurred here. He identifies as English and had no trouble proceeding in English. I don't agree that the transcript starts to reflect more and more that he's having trouble testifying in English. You can also see it the other way. He has trouble because of inconsistencies pointed out in his testimony and because of omissions in his testimony, and the immigration judge points out that his demeanor is appearing robotic and scripted. He starts to fumble. That's not due to a language barrier or any language barrier that's pointed out on the transcript. That goes to a really, really good point. If the immigration judge wants to get the benefit of substantial evidence, the substantial evidence, which is favorable standard, they have to make a record that gives them the full benefit of that, and it seems that if there was a more robust record here in terms of proficiency or anything else like this, then the case for substantial evidence of English language proficiency goes up, but we don't have, as I think Judge Ambrose said, we don't have a super robust inquiry here. At times, we have a choice between, I believe, English and Spanish, and that's the choice that's presented, and between the two, it makes sense to me that he would pick English, but I think that that's different than kind of a deeper colloquy, and I'm not saying we need a colloquy here, but I'm just saying, absolutely, it becomes harder to make a case that substantial evidence supports his English language proficiency. I respectfully disagree, Judge Fitz, about the cases that the government cited in its briefs. There's nothing like Bala Shabarim or Abu Shufali, where it's just simply, so, for example, in Abu Shufali, he was proceeding in English, but just peppered his testimony in English. Meanwhile, peppered him back to speaking Georgian. That was very obvious on the record. In Bala Shabarim, he could only answer yes or no in English, and he could only use very elemental English words. That was obvious on the record. There was not a robust record. Meanwhile, in this case, you have Kishore's asylum interview, which Immigration Judge had before him at the merits hearing, just to double down on the fact that Kishore keeps identifying himself as an English speaker, a native English speaker, over and over again, never mentions anything about speaking English, never requests a translator, and this is important because also, in the court's decision in Bala Shabarim, or I believe it's the case citing Senate Rajan, the distinction was the person requested an interpreter in a different language and was denied that. So the Immigration Judge was on notice of this other language. It was unreasonable that he proceeded in English. In this case, the Immigration Judge lacked any kind of notice that there was any other language lurking in the background until the end of the merits hearing, after he warned Kishore he was about to be found adversely credible. Meanwhile, the Immigration Judge was looking at the asylum interview and comparing it with his testimony for the average credibility determinations and sees that this colloquy with the asylum officer, I'm a native English speaker, I speak my daily life, I've been speaking English for a very long time, he says. And then meanwhile, the time of application written in English, his request for evidence written in English, his no problem understanding the Immigration Judge in English or expressing himself in English. This is the robust record the government offers. The Immigration Judge didn't think there was a problem, the finding that he was stilted and robotic in his demeanor. And as we noted in other Lashvali, that may well be consistent, that sort of repetition of statements that were made, for example, in his declaration here, would be consistent with a problem in communication, and where we have a record that it could be consistent one way and could be consistent the other. And the IJ didn't take the opportunity at the outset to ascertain the native language as being a different kind of English than standard or proper English. Which way should that fall? Well, that doesn't meet the standard of review, of course, describing it as potentially reasonable lines could differ over the demeanor finding, that doesn't meet the standard of review. That's a record compelled to conclude one way or the other, not that it could go one way or the other. But that's also the demeanor finding. So what when the court has overturned demeanor findings in the past, it's usually the petitioners for offer something about cultural differences, or PTFE has made them testify in a certain manner. I've not seen anything for offer in this record that says people who are speaking another language, perhaps, or a second language testify in a robotic, memorized way. The demeanor finding wasn't simply that he was robotic, it was that he was following a script, that he was, everything was memorized and the government pointed out the answer in brief. When IJ was putting up his declaration with his testimony at one point, and it was verbatim, that's not something that has to do with a language barrier, but anyone could do that. Any testifying person could do that, and there's been plenty of findings with demeanor based on scripted testimony that has nothing to do with a language barrier. That's simply a demeanor finding. We also have here, and the adverse credibility finding seems to be based in large part on inconsistencies that the judge perceived between his hearing testimony and his testimony and his interview. But fairly early on, he raises the concern when he's asked about the statement that he was detained and then that he was released because his father said he had no charge, and he responds, I never said that. Maybe the officer misunderstood what I say. To the extent that there are language issues that appear to inform the perceived discrepancies between the interview statements and hearing statements, doesn't that provide an additional basis for us to be concerned that there's not substantial evidence supporting the adverse credibility finding here? First, the easiest reason for this is that there are inconsistencies and possibilities that the immigration judge found that were not based on this. This was the inconsistency about the cousin. That is based on petitioner's asylum application and his testimony before the immigration judge. For example, while I think the first inconsistency about his brother's phone, that is based on inconsistent statements between his asylum interview and his merits hearing testimony. But the second inconsistency about his cousin is based on his asylum application, which he wrote, and his asylum interview, and you still have substantial evidence supporting the adverse credibility termination because you have the impossibility finding. You have the inconsistent statements about whether he saw the asylum in Mexico before he arrived in the United States. You have an inconsistent statement about his cousin, and you have the demeanor findings. Those are not based on the asylum interview. But the asylum interview statements, there's no reason to question the inconsistency. The government documents are presumed to be reliable. Meanwhile, the only thing he presented to cast doubt on the reliability of that transcript was a declaration submitted with a motion to reopen, which makes a baseless outlandish claim about the asylum officer threatening him. He said the asylum officer threatened him not to request a translator or else he would think his entire claim. I've never heard of such a thing in my experience. The transcript, I just want to be clear, we're talking about the asylum officer's notes? The transcript of the total fear hearing. The transcript of the credible fear hearing testimony. Okay, and is it your representation that that's a verbatim transcript? That was actually a transcription of the exchange? It is a transcription. It's not verbatim, which that means it's not maybe a word missing here or there, but it does represent what he said in front of the asylum officer. And this court has had no trouble finding these asylum interview transcripts reliable in the past. They found airport interviews unreliable. But asylum... It's not verbatim. I don't mean to mess with semantics here. I'm just trying to understand is it or is it not a transcript? Does this reflect the notes in memory of the asylum officer or is this a literal transcription? I believe it's in memory of the asylum officer. Okay, thank you. I'm not exactly clear on how that happens. If he's typing it as he does the interview or not. But again, commonly relied on inconsistency in asylum interviews and merit hearing testimony in the past. And this court had no trouble finding that supports an adverse credibility determination. If there's no further questions on the language access plan, I wanted to go to the first issue that was brought up by Mr. Cholante. Any further questions, colleagues on language access? No. Okay. I... Just if you can address the argument as to Leslie and where there is an executive order and implementation of it that is enforced by the agency itself. Why shouldn't the Leslie presumption kick in? There's simply never been a reason to extend Leslie to an internal policy memorandum. Leslie talks about regulations and never extended Leslie, a Supreme Court decision that relies upon and never extended a presumption of prejudice to internal policy memorandum. Because these were not implemented to benefit people that appear before the agency. They are rather as American Farms explained, these are flexible rules because they're just internal policy and were not adopted by ruling comment. And therefore, they're not meant to enforce. And that's exactly what the LAP said. Specifically in the LAP, this does not confer any enforceable rights. It is simply meant for internal management. And Leslie would provide a presumption, but I take it the government doesn't dispute the notion that those who are LAP status and the due process requires that those types of aliens be provided an interpreter. Do not dispute that. Due process does require someone's LAP to have an interpreter. And as a corollary to that, the government also agreed due process requires that there be some determination made at the outset of the hearing, whether someone is or is not LAP status. Yes, there will be some determination about, you can't just ignore someone who is LAP. That would be something that is unreasonable, I would say. It's not a due process matter at that point. You have to, as a matter of due process, provide an interpreter. But determination whether someone is LAP is subject to a reasonable standard, as this court has for a long time considered them. It can be unreasonable sometimes for immigration judges to proceed in English. Other times, it is reasonable. On this record, the government argues it is reasonable in this case, in contrast to prior cases like Abu Shabali and Bala Sabirah, where it was unreasonable to proceed. But I'm sorry, I need to cut out a little bit with the audio. In terms of making an assessment at the outset, whether someone is LAP status, the government agrees due process requires that there be some determination at the outset of a hearing, whether an interpreter is required or not. Right? Yes, but that is still subject to a reasonable determination. What determination that the LAP is subject to reasonableness? Because here, for example, especially if the LAP reminds us that someone speaks a dialect of the language and otherwise self-identifies as an English speaker, it can be difficult for an immigration judge to determine if another language or dialect is lurking in the background. And so while due process requires an interpreter for someone's LAP, immigration judges' efforts to determine this is still just a reasonable determination, whether it was reasonable on the record. So due process does require that LAP determination, but determination itself is a matter of reasonableness. And that's what the government is arguing all along, that just as before the LAP was adopted and after, the court has just simply looked to whether or not it was reasonable for the immigration judge to proceed this way. Anything further on language issues? No, thank you. Peter? No. Okay. Let me go to the SCNC card. BC claims that the government had his SCNC card during the course of the proceedings, but inexplicably, and it argues unreasonably, withheld it until after the appeal to the BIA was complete. Do you know why the government withheld the document? I do not know why it took so long for them to produce the document. I know those requests are on the record and it simply takes a while. And if it was a case where some evidence took this long and ended up being material to the claims, then that might be a ground for prejudice. But as the board determined, this was not material to the adverse credibility determination. But his theme was that he cannot go back to Cameroon because the government was targeting him because of his membership and involvement with the Southern Cameroon Council. And if he proves that he's a member of it, as Mr. Cervantes said, isn't that maybe the key piece of the puzzle for his argument that he's being targeted? No. No, it is not. The key piece of his argument is that he was persecuted because of his membership, that he attended a rally and his brother was shot and he was interrogated because of his brother's phone, and he was arrested again because of his membership. That is the key piece of his claim. And that is what the immigration judge is finding not credible. He may or may not be a member of SCNC. What he has to show is that this persecution happened to him because of his membership. But wasn't some of that credibility determination based on the fact that there was, I guess, different statements between whether he was a member or not and other things like that? And he couldn't prove it because he didn't have a card. And so it strikes me that if his lack of being able to prove this was a reason for adverse credibility determination, then it is material to the adverse credibility determination. It might not be, it might not change the outcome of that determination, but at least bears on it. And that's what a motion to reopen is all about when evidence, when it's especially timely like this one was and when the evidence truly wasn't available beforehand. So, I mean, this strikes me is, I mean, I'm struggling a little bit to find out why this motion to reopen wasn't granted, at least for the SCNC card. The professors, that might've been available for a long, long time. I don't think that they acquired their expertise in the 30 or 60 or 90 days after the hearing. They probably had that for a long time, but the SCNC card is very different. It wasn't available. He says it's material. Why isn't that a basis for reopening? I have two responses for why it remains immaterial. One petitioner is framing it as a lack of corroboration. The immigration judge made a lack of corroboration findings studying the corroboration statute, but that's not what the immigration judge says in his decision. Immigration finds an inconsistency independent of the card. He looks at the assignment and says, you say when asked if you're an SCNC member, no, you say you're not a member. Then before me, you are a member. That's inconsistent. That's the inconsistency. Then in his decision, he says, meanwhile, you haven't submitted a card, but he doesn't say that he's finding that inconsistency due to lack of corroboration. Inconsistency exists independent on the record. Therefore, when he submits it later on to the board, this is what the board is finding. That just doesn't make any difference. It wasn't a lack of corroboration findings. It was that you made inconsistent statements about whether you're a member. Meanwhile, the fact that he had a card in his possession when he came across the border and still would answer a question about his membership, saying he's not a member, just further could also be seen as someone who is not credible. Again, someone who is portraying a claim of persecution to happen to someone else as his own. He has a membership card. He memorized the testimony that the immigration judge saw. It's reasonable for the immigration judge to find that maybe he was not presenting his own claim. That's why the card is also immaterial. It's also immaterial for the third reason that there were other inconsistencies that had nothing to do with the card. You take away the SCMP membership inconsistent statement, and there's still other ones. The impossibility findings, the cousin, the statement about the cousin, the statement about whether or not he satisfied on his way to Mexico, which I would add, he's explaining his inconsistency about Mexico. He said the whole reason he was coming to the United States was to go to a country that spoke English. That's why he didn't speak Islam in these countries. Then he comes around and says later on that, no, I actually don't speak English. I speak pidgin English. It doesn't make any sense that he would come to the United States because he speaks English and then say he doesn't speak English. It seems as if you're matching the corroborative issue with the motion to reopen. On corroboration, what the IJ said is I considered generically all the evidence. Well, it turns out that one of the key pieces of evidence, the fact on which there was an adverse credibility determination made, was whether he actually belonged to the Southern Cameroon Council. I think the IJ at one point conceded, I don't have the page in front of me, that members of the SCNC would likely be entitled to asylum. If that's the case, if I'm stating that correctly, Mr. Talante's point about this being maybe the key piece of evidence stands pretty good. In my research, it certainly didn't mean that someone just simply shows they're a member of a political organization that they're entitled to asylum. They have to testify credibly of what happened to them because of their membership. So, that's why it's not the key piece of evidence in this case. But the key is that- Isn't the point that the IJ said it was important to him? The IJ indicated it carried the weight that Judge Ambrose was just describing. So, that tells us that it may well make a difference, right? No, I don't agree. I read the immigration decision. I'm looking at the analysis of the adder's credibility determination. And what he first and foremost says is that there's substantial and material inconsistencies in this claim. And that's why I can't find he established his claim for asylum, not simply because he didn't have a membership card or some other piece of corroborative evidence. There is no corroboration finding in the immigration decision. It is based on his inability to testify consistently. His demeanor findings, the fact that he implausibly testified about how he left Cameroon, that is what the immigration says. And he says it's unfathomable, the immigration judge says, that he would omit testimony about his cousin. I'm reading the immigration decision right now. This is not- An immigration judge has any questions in his mind about someone's membership card alone being something that would change their opinion. They're looking at the unfathomable in his opinion, in his words, testimony about omitting the cousin's disappearance, the numerous substantial inconsistencies about his brother, not mentioning his brother's phone whatsoever in testimony. And that seems to be the centerpiece of this claim for the asylum interview. That's what the immigration judge is looking at. And while he may have said something in the preliminary hearings about the card, how important it is to be a member, by the time he reached his ultimate conclusion that he wrote down his written decision, it was based on numerous substantial inconsistencies. He says ostensibly lack of membership card, anything like that. If members of the council could be entitled to asylum, and he can prove that he was a member of the council, which is contrary to an adverse credibility determination on one issue made by the IJ, it would seem to any reasonable person, this is pretty darn important. Having a card alone does not prove someone had the same persecution happened to him. If he possessed a membership card, it doesn't show that the police shot at him and his brother, the police killed his brother, that they interrogated him on his phone during the first arrest, they arrested him again. And that's what the citation published to the IJ. And still have tried to proper your claim and gotten these documents together, but you still can be found adversely credible because not really a claim that happened to you in the immigration judge's opinion. And that's the other thing to debate. It almost sounds like your argument is, look, I don't know why the government didn't produce this card, even though they had it possession. But don't worry about it. It's irrelevant or immaterial. And in fact, it is the key adverse credibility determination. He didn't prove that he was a member of the SCNC. And it turns out, contrary to what the immigration judge may have thought, it turns out the man was a member. And so that sounds to me, not that you don't win in the end, you may, but it sounds to me like it calls for a do over. Respectfully, that's not, that must have been a misunderstanding on my behalf. That is not what the government is arguing. It's not the fact that he was or was not a member. The critical evidence is whether or not this persecution happened to him because he was a member. So he could be a member and nothing ever happened to him. But what he's claiming is that he was a member. And then afterward, the military shot him and his brother. They killed his brother. He was arrested. He was arrested again, and he was detained. That is the key part of his claim. Because you have to show persecution, you have to show well-founded fear of persecution, not that you're just a member of an organization. Anyone can set up an organization and qualify for asylum. If the IJ says that, if you are a member of this organization, that you would likely be entitled to asylum, that means implicit that you have been persecuted. And therefore, it is important to show that you are a member of this organization. And then of course, the government can say, no, this particular individual would not be persecuted. But it comes down to, Mr. Talante says it's the key piece of the puzzle. And the more and more I'm looking at this, it seems as if it's a key piece of the puzzle. He may not win in the end, but at least he gets a chance to present his case and show his evidence that was withheld. I do not believe the immigration judge meant that. That would be just going through one inconsistency. It doesn't have anything to do with the other inconsistencies that were cited by the immigration judge. This car has nothing to do with the other inconsistent statements about whether or not he traveled through Mexico and sought asylum, whether or not his cousin was persecuted as a result of his STNC membership, whether or not he was arrested because of his brother's bomb. That's the key part of the case. So just to tease this out, if I understand, in addition to those reasons, if I understand the reason that you're defending the BIA's finding of conflicting statements about his membership in the STNC, that's enough to justify a finding of lack of credibility, or at least going down the road of lack of credibility. If he had a card that showed he was a member, his statements are still inconsistent because at one point in time he said he wasn't a member. If he had signed affidavits of 100 people that said he was never a member but no card, similarly that would be just inconsistent. Either way, what you're saying in essence is because he said at one point in time he was a member and at one point in time said he was not a member but a supporter, that distinction makes the card irrelevant because he already said two things that can't be reconciled with a card. Am I understanding your point correctly? That's exactly the government's point. Yes. Yes, that's exactly the government's point. It can be just as damaging viewed in that way, that he has his card in possession, that he was an immigration judge found, he may have manufactured his claim based on other people's claims and he came with his card and would still answer a question directly about the card by saying I'm not a member. That's someone who you could just as reasonably infer is not testifying to a personal account of persecution but is simply trying to pass off another's account and that happens a lot unfortunately in asylum law and that's what the immigration judges have to determine. That's why I'm looking at it. I've seen plenty of cases where they have membership cards to various organizations around the world and they're still found to be not credible because they can't keep their story straight after that. But what happened to them because of that card? All right, any further questions to my colleagues? We've had you up here for almost 40 minutes. Okay, thank you. Thank you. Mr. Chilanti, we'll give you five minutes and that'll be a hard five. Thank you, Judge Ambrose, and recognizing probably standing between you and lunch and you with me, I want to address a couple quick things and start with where council ended. The problem with the council's approach in terms of persecution, it doesn't appreciate that you can obtain asylum based on past persecution but also based on the possibility of future persecution and so this card provides prima facie evidence of potential future persecution and this court's ruling in CO10 Wong, I'm sorry I'm getting that wrong, 539 FED 2225, talked about the objective and subjective components of asylum. One is you have to have to see for well-founded fear, you have to have subjectively have well-founded fear, be fear for but the objective component requires the person to show that a reasonable person in his position would fear persecution either because he would be individually singled out for persecution or because there's a pattern of practice in his home country of persecution against a group of which he's a member and that's the SCNC. The records show that they've been banned since January 2017, that's in 663 of the record. The IJ repeats my quote, the first time he looked at this case and looked at the country conditions on June 1st, he said it's pretty clear that there's arbitrary arrests and detention for people that support a southern Cameroonian independence and people get hurt, that's on 499 and he also said at the hearing it's problematic, I quote, it's problematic for true SCNC supporters as far as political opinion, that's 595. So I know council is talking about past persecution but if this card establishes that he's a member of the SCNC which it does with a prima facie basis and the country conditions show that SCNC members are being persecuted, if anything the conditions have gotten worse, then he's entitled, you know, he's entitled to asylum. This is not a card for Sam's Club, this is for being a member of an organization that is under tremendous persecution by the Cameroonian government and I wanted to get back to a question Judge Krause had asked, you know, our request is that this be remanded all the way to the immigration judge rather than to the BIA open the record and do another analysis. We think the appropriate remedy given the IJ's uncertainty and the IJ's, the primacy which IJ placed on SCNC membership that he be allowed to look at this card and view the evidence in a different way and with respect to the lack of disclosure, the problem here wasn't just that the government didn't disclose it, is that the having not disclosed this card, the government on cross-examination then asked BC, show us evidence that you're a member of this organization. Of course, BC's answer, if he, we believe he had pigeon a translator, English translator who said you have the evidence, I've asked for it on multiple occasions and you've not gotten back to me and to tie that point a little bit is even after he obtained counsel, it took another five or six months until March 2019 until he was able to obtain a copy of that card. So, and I would also request if with the court's permission that we supplement the record with a color copy of the it's relevant. Obviously, it's up to the court, but having seen that what was in front of the BIA is important. With respect to the language access issue, I mean, our view is that the substantial evidence does not support the IJ denying BC the opportunity to pigeon a translator. The issue, pigeon English translator, the issue here, and this is from the language access plan, it makes clear that it is, quote, it is the responsibility of EOIR and not the LEP person, end quote, to ensure that there's a communication between the LEP person and EOIR. And as counsel would say, it was the obligation of BC to actually say, hey, I speak English by English, I mean, proper English and not pigeon English. And that's not supportable. With respect to reasonable steps, there are no reasonable steps. March 23rd, the full extent of the colloquy on language was, how are you, sir, quote, how are you, sir, Spanish or English? It's on 460. That is not reasonable under any circumstances. And in fact, if anything, we have, and there are at least three other occasions on that same master calendar hearing where people come before Judge Ellington, and he says, Spanish best, Spanish best. And so he recognized that the inquiry really is, what is your best language? Not, you know, it's between English or Spanish. Obviously, BC chose English. And another point too, and I'm coming up my, I know I got a couple, be one or two minutes left, is when defining limited English proficiency, the plan makes clear, just because you're proficient in one aspect, it doesn't mean that you're proficient in another aspect. So the LEP persons may be competent in certain types of communication, e.g. speaking or understanding, but still be LEP for other purposes, reading or writing. And so the fact that, you know, he may have been comfortable doing something or writing does not mean that in an adversarial setting, being cross-examination without counsel, reciting very traumatic events, that he was able to participate fully. And with respect to participation, the true test is, is he able to participate as somebody who's fully English proficient and is able to? If you look at meaningful access, the definition on 203 of the record, it says meaningful access denotes access that is not restricted, delayed, or inferior as compared to programs and activities provided to English proficient persons. The same thing with language assistance services. It says the LEP persons are supposed to have an, quote, an equal opportunity to participate fully in the services, activities, or other programs administered by the agency. And so when DOJ in our appendix on page 60 talked about the cases they actually pursue against state courts, they say, and I quote, court cases are often highly structured, stressful experiences requiring specialized terminology without careful attention to providing effective language services. Many people have a judicial process that places unfair and unconstitutional burdens on their ability to fully participate in proceedings. That is what we have here. And, and, you know, I, I will end on that because I think, you know, having DOJ's own words in that context is, is, is very important because at the point that the court, Judge Ellington knew, he said, I speak pidgin English. That's my local language. At a minimum, at that point, he should have said that is your best language and allowed him to get an interpreter. Thank you very much. Thank you to both counsel for very well presented and brief arguments in connection, working backwards in connection with the card that you wish to send, if you want to attach that to a 28-J letter or something like that, that's fine, although it's not necessary. Did your firm take this matter pro bono? No, I, yes, the firm took it pro bono. I was consulted by co-counsel and I, you know, the opportunity to, to work around the clock and be prepared is an opportunity I could not miss. And I appreciate you, Judge Ambrose, Judge Cross, and Judge Phipps for giving us the opportunity to, to get involved and, and to be before you. Thank you. It's very, very, very important case. I would ask if a transcript could be prepared of this oral argument and would it be okay just to split it between Deckert and the government? Was that okay? No objection from, from our side. Okay. And, and I want to note too, Your Honor, that this is a case, as you mentioned, is important, but it's particularly important to a lot of immigrants who are, you know, discussing language access. And because the government never addressed access in its response, we appreciate the supplemental, the request for supplemental briefing to really put in focus some of, some of these important issues. Thank you. Thank you to you and Mr. Ramnitz and we'll take the matter under advisement.